**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

EMPOWER FEDERAL CREDIT UNION,

                               Plaintiff,                  5:23-cv-941 (BKS/MJK)

v.

EMPOWER ANNUITY INSURANCE COMPANY OF
AMERICA,

                              Defendant.

---

**Appearances:**

*For Plaintiff:*
Nicholas Mesiti
Brett Hutton
Thomas L. Sica
Heslin Rothenberg Farley & Mesiti P.C.
5 Columbia Circle
Albany, NY 12203

*For Defendant:*
Adam Weiss
Mark Deming
Polsinelli PC
150 N. Riverside Plaza, Suite 3000
Chicago, IL 60606

Richard S. Hartunian
Manatt, Phelps & Phillips, LLP
7 Times Square
New York, NY 10036

**Hon. Brenda K. Sannes, Chief United States District Judge:**

**MEMORANDUM-DECISION AND ORDER**

## I.    INTRODUCTION

       Plaintiff Empower Federal Credit Union brought this action against Defendant Empower

Annuity Insurance Company of America, alleging federal and state trademark infringement and

related claims. (Dkt. No. 1). Defendant subsequently filed counterclaims alleging federal and

state trademark infringement and related claims against Plaintiff. (Dkt. No. 40).[1] Presently before

the Court are three motions: Defendant's partial motion to dismiss pursuant to Rule 12(b)(6) of

the Federal Rules of Civil Procedure, (Dkt. No. 10); Plaintiff's partial motion to dismiss

counterclaims pursuant to Rule 12(b)(6), (Dkt. No. 46); and Plaintiff's motion to strike pursuant

to Rule 12(f), (Dkt. No. 35). The motions are fully briefed, (Dkt. No. 10-1, 22, 24, 35-1, 39, 43,

46-1, 48, 51). For the following reasons, the Court grants in part and denies in part Defendant's

partial motion to dismiss, grants in part and denies in part Plaintiff's partial motion to dismiss

counterclaims, and grants in part and denies in part Plaintiff's motion to strike.

## II.    FACTS[2]

### A.    The Parties

Plaintiff "is a financial services company," in the form of a federal credit union, "offering

banking, online banking, loans, and credit card services, amongst other financial services, to its

customers." (Dkt. No. 1, ¶¶ 5, 7). It operates in ten counties within central and western New

York, including at approximately 28 physical locations. (*Id.* ¶¶ 7, 25).

Defendant "is the second-largest retirement plan provider in the United States," tracing

its existence to 1891. (Dkt. No. 40, ¶ 10). It "offers a myriad of financial services and related

products to individual customers throughout the United States," including "retirement and

investment products and services, personal finance and portfolio management products and

---

[1] Defendant originally filed counterclaims against Plaintiff along with its answer and affirmative defenses on December 8, 2023. (Dkt. No. 28). After Plaintiff filed a motion to dismiss the counterclaims and a motion to strike the affirmative defenses, (*see* Dkt. No. 35), Defendant filed amended counterclaims, (Dkt. No. 40).

[2] The facts are drawn from the complaint and attached exhibits, (Dkt. Nos. 1–1-6) and the amended counterclaims and attached exhibits, (Dkt. Nos. 40–40-2). In evaluating each "motion to dismiss, the Court accepts as true all well-pleaded factual allegations and draws all reasonable inferences in favor of the non-moving party." *Howard v. Carter*, 615 F. Supp. 3d 190, 193 (W.D.N.Y. 2022) (quoting *Hooks v. Forman, Holt, Eliades & Ravin, LLC*, 717 F.3d 282, 284 (2d Cir. 2013)).

services, and advisory and educational resources," and its "products and services are available online and can be accessed by participants via [its] web-based platform, website, and [] mobile application." (*Id.* ¶¶ 11, 12).

### B.   Plaintiff's Formation

Plaintiff alleges that it was formed in 1939 under the name Power Federal Credit Union ("Power FCU"). (Dkt. No. 1, ¶¶ 15–16).  Attached to the complaint is a redacted version of a signed Merger Agreement, dated August 17, 2006, which indicates that Empire Federal Credit Union ("Empire FCU") agreed to merge into Power FCU, and that the resulting credit union would be named Empower Federal Credit Union–Plaintiff's current name. (Dkt. No. 1-2, at 4–5; *see also* Dkt. No. 1, ¶ 17).

Defendant has attached a non-redacted version of the Merger Agreement to its amended counterclaims in the form of an attachment to a letter from Mark A. Triechel, a Reginal Director at the National Credit Union Administration (NCUA). (Dkt. No. 40-2, at 2–7). The letter approves the merger plan of Empire FCU and Power FCU and states that "the effective date of the merger is January 1, 2007." (*Id.* at 2).

### C.   Plaintiff's Marks

Plaintiff asserts ownership of U.S. Trademark Registration Number ("U.S. Reg. No.") 4,418,865 (the "Word Mark Registration") for EMPOWER FEDERAL CREDIT UNION (the "Word Mark"), which covers "'[f]inancial services for credit union members, namely, savings, checking, retirement, and education savings accounts, loan financing for personal, real property and student loans, automated teller machine services, credit card services, debit card services, [and] [online] banking services' in International Class 36." (Dkt. No. 1, ¶ 8; Dkt. No. 1-1, at 4). The Word Mark Registration certificate, reflecting a registration date of October 15, 2023, indicates Power FCU is the owner of the Word Mark. (*See* Dkt. No. 1-1, at 4). Several filings

3

related to the Word Mark Registration, and Application Serial No. 78950139 (the "Word Mark Application"), were made in Power FCU's name, including on August 11, 2006, July 29, 2013, November 14, 2018, and on December 5, 2022. (*See* Dkt. No. 40, ¶¶ 46, 49, 52–53).

Next, Plaintiff asserts ownership of U.S. Reg. No. 4,428,988 (the "Design Mark Registration") for EMPOWER (the "Design Mark") which covers the same categories as the Word Mark in International Class 36. (*See* Dkt. No. 1, ¶ 9; Dkt. No. 1-1, at 2). On October 19, 2006, Application Serial No. 77024610 (the "Design Mark Application")), "the application from which the [] Design Mark Registration issued, was filed . . . in the name of Power FCU." (Dkt. No. 40, ¶ 55). The Design Mark Registration certificate, reflecting a registration date of November 5, 2013, indicates that Plaintiff is the owner of the Design Mark. (*See* Dkt. No. 1-1, at 2).

Lastly, Plaintiff asserts ownership of "common law rights in trademarks and service marks including the word mark 'EMPOWER', covering various services including, but not limited to, banking, online banking, loans, credit card, wealth management and term life insurance services, as well as other financial services offered by" Plaintiff. (Dkt. No. 1, ¶ 11). The Word Mark, Design Mark, and Plaintiff's marks at common law have each been used in connection with Plaintiff's service offerings, including "banking, checking, savings, retirement accounts, credit cards, loans, tax, term life insurance, wealth management and other services in interstate commerce" beginning "at least as early as 2007." (*Id.* ¶ 24).

### D.    Defendant's Adoption of "Empower" Branding

In 2014, Defendant, then doing business as Great-West Life and Annuity Insurance Company, began providing retirement services under the name EMPOWER RETIREMENT. (*Id.* ¶¶ 32–33). Defendant thereafter began expanding the use of EMPOWER RETIREMENT to

cover various services, such as individual retirement accounts and health savings accounts. (*Id.* ¶¶ 38–40). Then, "[i]n 2022, Defendant changed its name to EMPOWER ANUITY INSURANCE COMPANY OF AMERICA" and "underwent a major rebranding and advertising campaign, and changed its public facing brand name to EMPOWER." (*Id.* ¶ 41). At this time, "Defendant also expanded its service offerings to include services similar to traditional banking type services." (*Id.* ¶ 43).

### E.    Defendant's Marks

Defendant owns "numerous United States trademark registrations incorporating the term EMPOWER," including for the following marks: U.S. Reg. No. 5,256,647 (dated August 1, 2017) for  ; U.S. Reg. No. 5,407,837 (dated February 20, 2018) for  ; U.S. Reg. No. 6,216,958 (dated December 8, 2020) for EMPOWER HEALTH SAVINGS ACCOUNT; U.S. Reg. No. 6,064,550 (dated May 26, 2020) for EMPOWER HSA; U.S. Reg. No. 6,064,551 (dated May 26, 2020) for EMPOWER DYNAMIC RETIREMENT MANAGER; U.S. Reg. No. 6,053,841 (dated May 12, 2020) for EMPOWERUP; U.S. Reg. No. 6,053,897 (dated May 12, 2020) for  ; U.S. Reg. No. 6,053,898 (dated May 12, 2020) for  ; U.S. Reg. No. 5,743,480 (dated May 7, 2019) for ; U.S. Reg. No. 6,043,302 (dated April 28, 2020) for EMPOWER SELECT; U.S. Reg. No. 7,056,305 (dated May 16, 2023) for PERSONAL CAPITAL AN EMPOWER COMPANY; and U.S. Reg. No. 7,056,306 (dated May 16, 2023) for  . (Dkt. No. 1, ¶ 49; Dkt. No. 1-3, at 2; *see*

*also* Dkt. No. 40, ¶ 14[3]). None of these marks have registrations listing banking services. (*See* Dkt. No. 1, ¶ 50). Defendant has additionally "filed numerous pending 'intent to use' trademark applications incorporating the term EMPOWER," some of which list banking services as intended uses for the marks. (*Id.* ¶¶ 51–52). Defendant "now regularly and consistently refers to itself as 'Empower' without any additional words or design features" and "claims ownership in the mark 'EMPOWER' by itself." (*Id.* ¶¶ 53–54). Defendant has also taken steps against other entities who used or sought to use the term "Empower" in their marks, including opposition proceedings before the Trademark Trial and Appeal Board of the USPTO and through litigation. (*Id.* ¶¶ 77–87).[4]

### F.     Customer Confusion

Plaintiff's "branch staff and call center now field numerous calls a month and/or walk-in prospective customers that confuse Defendant's financial services with Plaintiff's banking, financial and wealth management services." (*Id.* ¶ 71). One instance of confusion involved Plaintiff's receipt of "a letter from Athene Annuity and Life Company," on April 11, 2023, "concerning a transfer request from a customer of Defendant for a 1035/rollover/transfer of funds valued in excess of three hundred thousand dollars to be deposited into an annuity contract at Athene." (*Id.* ¶ 72). The customer had sent Plaintiff "sensitive customer information, including" the customer's "name, social security number and account value." (*Id.*). After this incident, Plaintiff began tracking incidences of customer confusion, noting twenty-seven calls in

---

[3] Defendant also pleads in its amended counterclaims it owns the above marks (although it does not mention U.S. Reg. Nos. 7,056,305 and 7,056,306), and states "[t]hese marks are registered in connection with various financial services, including financial record keeping, financial administration of pension and retirement plans, investment and retirement fund management, and mutual fund investment services." (Dkt. No. 40, ¶ 14).

[4] Defendant owns a number of other marks, both at common law and through federal registrations, relating to its "corporate naming rights agreement" with a football stadium in Denver, Colorado, "now known as Empower Field at Mile High." (*See* Dkt. No. 40, ¶¶ 23, 27, 28).

one three-month period that asked about Defendant's services. (*Id.* ¶ 73). Plaintiff's customers have also called in, unable to access their account after downloading Defendant's mobile application. (*Id.* ¶ 74).

## III.    MOTIONS TO DISMISS

### A.    Legal Standard[5]

To survive a motion to dismiss under Rule 12(b)(6) for failure to state a claim, "a complaint must provide 'enough facts to state a claim to relief that is plausible on its face.'" *Mayor & City Council of Balt. v. Citigroup, Inc.*, 709 F.3d 129, 135 (2d Cir. 2013) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Mere "labels and conclusions" are insufficient; rather, a plaintiff must provide factual allegations sufficient "to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555 (citations omitted). The Court must "accept all factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff." *E.E.O.C. v. Port Auth.*, 768 F.3d 247, 253 (2d Cir. 2014) (citing *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007)). Additionally, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

### B.    Defendant's Motion to Dismiss

Pursuant to Rule 12(b)(6), Defendant seeks to dismiss Plaintiff's claims for unfair competition and palming off under New York common law and claims of trademark dilution, deceptive trade practices, and unfair competition under Sections 360-l, 349, and 350 of the New York General Business Law. (Dkt. Nos. 10, 10-1).

---

[5] The same standards apply to a motion to dismiss a counterclaim as to a motion to dismiss a complaint, with pleadings "construed 'in the light most favorable to [the counter-claimant], resolving all doubts in [the counter-claimant's] favor.'" *Zurich Am. Life Ins. Co. v. Nagel*, 571 F. Supp. 3d 168, 175 (S.D.N.Y. 2021) (citation omitted).

### 1.     Unfair Competition and Palming Off

Defendant claims that Plaintiff has not adequately pleaded a claim for unfair competition or palming off on the grounds that Plaintiff has not alleged facts supporting either a theory of palming off or misappropriation and has failed to allege bad faith or special damages.  (Dkt. No. 10-1, at 8–10; Dkt. No. 24, at 6–11).

"New York law recognizes two 'theories' of common law claims for unfair competition: palming off and misappropriation." *RBG Mgmt. Corp. v. Vill. Super Market, Inc.*, 692 F. Supp. 3d 135, 152 (S.D.N.Y. 2023) (quoting *ITC Ltd. v. Punchgini, Inc.*, 850 N.Y.S.2d 366, 372 (2007)). "To prevail on a claim of unfair competition under New York law under either a misappropriation or a palming off theory, a plaintiff 'must show a likelihood of confusion or deception of the consuming public as to the source of the allegedly infringing product [or service] and bad faith on the part of [d]efendants.'" *Rockland Exposition, Inc. v. All. of Auto. Serv. Providers of N.J.*, 894 F. Supp. 2d 288, 326 (S.D.N.Y. 2012) (quoting *Tri-Star Pictures, Inc. v. Unger*, 14 F. Supp. 2d 339, 363–64 (S.D.N.Y. 1998)).

### a.     Palming Off

Defendant argues that Plaintiff has not adequately pleaded palming off "because there is no allegation that [Defendant] has ever marketed its services as emanating from [Plaintiff] or that any consumer has ever obtained services from [Defendant] under the impression it was obtaining services from" Plaintiff. (Dkt. No. 10-1 at 9 (citing *CDC Newburgh Inc. v. STM Bags, LLC*, 692 F. Supp. 3d 205, 226 (S.D.N.Y. 2023))). Plaintiff responds that it is sufficient to "to allege that Defendant used colorable imitations of Plaintiff's marks in connection with the sale and marketing of Defendant's services to confuse or deceive customers." (Dkt. No. 22, at 14–15; *see also* Dkt. No. 1, ¶¶ 107, 113, 135).

"Palming off involves the sale of the goods of one manufacturer as those of another."
*RBG Mgmt. Corp.*, 692 F. Supp. 3d at 152 (internal quotation marks omitted) (quoting *Red*
*Mountain Med. Holdings, Inc. v. Brill*, 563 F. Supp. 3d 159, 181 (S.D.N.Y. 2021)); *see also ITC*
*Ltd.*, 850 N.Y.S.2d at 372 n.2 (explaining that "'[o]ne of the most obvious forms' of palming off
'occurs when the copier of an article overtly and explicitly misrepresents it's source[, for
example], where [a] defendant . . . substituted its product for plaintiff's when customers
specifically asked for plaintiff's product.'" (citations omitted)).

Defendant's assessment of Plaintiff's claim is correct: "[a]t best, [Plaintiff] alleges that
[Defendant] is selling its own products and services in a manner that may be likely to cause
confusion among consumers." (Dkt. No. 24, at 9). Plaintiff's allegations regarding Defendant's
alleged deception do not contain any facts indicating Defendant has attempted to sell its products
as the products of Plaintiff. (*See* Dkt. No. 1, ¶¶ 107, 113, 135). Failure to allege such facts has
previously led to the dismissal of a palming off claim. *See CDC Newburgh Inc.*, 692 F. Supp. 3d
at 226 (finding that the plaintiff "failed to plead" unfair competition under a theory of palming
off because the "[p]laintiff [did] not offer any credible allegations that [d]efendant copied its
products or substituted its products for [p]laintiff's products."). Plaintiff does not point to any
case law suggesting that similar allegations to the ones made here have been held sufficient to
state a claim. (*See* Dkt. No. 22, at 14–15).

Accordingly, the Court grants Defendant's motion to dismiss Plaintiff's claim of unfair
competition under a theory of palming off.

### b.    Misappropriation

In response to Defendant's opening brief, Plaintiff argued that it had also sufficiently
alleged a theory of trademark misappropriation. (Dkt. No. 22, at 10–13). Defendant in its reply
argued that Plaintiff had not stated a claim of unfair competition under a misappropriation

theory, both because Plaintiff did not explicitly refer to misappropriation in its complaint and because "there are no credible, non-conclusory allegations that [Defendant] was exploiting [Plaintiff's] efforts for its own advantage." (Dkt. No. 24, at 9–11).

"To state a claim for the misappropriation theory of unfair competition, a plaintiff must allege that the defendant: (1) misappropriated the plaintiff[ ]'s labors, skills, expenditures, or good will; and (2) displayed some element of bad faith in doing so." *CDC Newburgh Inc.*, 692 F. Supp. 3d at 226 (internal citation marks omitted) (quoting *Barbagallo v. Marcum LLP*, 820 F. Supp. 2d 429, 446 (S.D.N.Y. 2011)). "While courts have noted that the misappropriation theory of unfair competition is 'broad and flexible,' it is nevertheless limited to instances where a defendant took 'the skill, expenditures and labors' of plaintiff in bad faith and employed it for 'its own commercial advantage.'" *RBG Mgmt. Corp.*, 692 F. Supp. 3d at 152 (quoting *Red Mountain Med. Holdings, Inc.*, 563 F. Supp. 3d at 181)).

Contrary to Defendant's assertions, Plaintiff concretely pleads a misappropriation theory of unfair competition in its complaint. (*See* Dkt. No. 1, ¶¶ 135 ("Defendant has misappropriated the Empower Marks by using colorable imitations of the Empower Marks on or in connection with the advertising marketing, promotion and sale of Defendant's goods and services."); 136 ("Defendant's aforesaid acts constitute unfair competition . . .")). Defendant specifically argues that because of the difference in their clients and markets, Defendant "does not, and simply cannot 'free ride' on [Plaintiff's] 'skill, expenditures and labors.'" (Dkt. No. 24, at 10–11). But Plaintiff alleges that it "enjoys a valuable goodwill and an enviable reputation with respect to its service marks and, in particular, the services associated therewith," (Dkt. No. 1, ¶ 31), that since 2014, "Defendant has expanded its products, services and use of EMPOWER," (*id.* ¶ 62), and that "[d]uring this expansion, Defendant has also directed its marketing, advertising, and

provision of services into this judicial district and to residents of New York, including Plaintiff's customer base," (*id.*). Such facts plausibly suggest the misappropriation of Plaintiff's property for Defendant's own benefit.

Defendant also challenges whether Plaintiff has sufficiently alleged bad faith, characterizing any allegations of bad faith as "conclusory and insufficient to state a claim." (Dkt. No. 10-1, at 9). In response, Plaintiff asserts that its allegations of "Defendant's knowledge of Plaintiff's [] Marks, both at the time it commenced use of the term EMPOWER and thereafter and Defendant's intent to profit from Plaintiff's mark alone . . . are more than sufficient to establish bad faith so as to survive a motion to dismiss." (Dkt. No. 22, at 12–13 (citing Dkt. No. 1, ¶ 61)).

In evaluating a claim of unfair competition under New York law in a trademark case, "'when the junior user has prior knowledge of the senior's mark and the marks are so close as to infer copying' courts find the defendant has acted in bad faith." *WM Int'l, Inc. v. 99 Ranch Mkt. #601*, 329 F.R.D. 491, 499 (E.D.N.Y. 2019) (quoting *Peek & Cloppenburg KG v. Revue*, *LLC*, No. 11-cv-5967, 2012 WL 4470556 at *6, 2012 U.S. Dist. LEXIS 140691, at *15 (S.D.N.Y. Sept. 19, 2012)).

The Court finds that Plaintiff has adequately alleged both knowledge and similarity of the marks so as to survive a motion to dismiss. First, regarding knowledge, Plaintiff has alleged that Defendant is aware of Plaintiff's marks, (Dkt. No. 1, ¶ 61), that these "marks are inherently distinctive and/or have acquired distinctiveness," (*id.* ¶ 14), that these marks "have been used in connection with substantial consumer sales and deposits as well as in advertising and promotion, and function as identifying services originating from, sponsored by, or associated with Plaintiff," (*id.* ¶ 28), and that "Plaintiff has spent and continues to spend large sums of money in the

promotion, advertisement, and sale of its services under" its marks, (*id.* ¶ 31). Such allegations

are similar to those found to be sufficient in *WM Int'l, Inc*, including that the "mark [had] been

used extensively in commerce [for decades], becoming both distinctive and prominent" and that

"upon information and belief, defendants . . . were aware of [p]laintiffs['] [mark] . . . at the time

defendants . . . adopted and began to use [the] infringing designations.'" 329 F.R.D. at 500.

Second, Plaintiff has alleged facts suggesting the similarity of the marks, including that

"Defendant has used in commerce, without Plaintiff's consent, reproductions, counterfeits,

copies or colorable imitations of [Plaintiff's] Marks including 'EMPOWER,'" (Dkt. No. 1, ¶

113; *see also id.* ¶¶ 107 (referring to Defendant's use of "colorable imitations of" Plaintiff's

Marks), 135 (same)). Here too, similar allegations have been deemed sufficient. *See WM Int'l,*

*Inc.*, 329 F.R.D. at 500 (finding allegations sufficient "to infer copying" where the plaintiff

alleged defendant's mark was "'an exact duplication' of [p]laintiffs' logo.").

Defendant argues that the cases Plaintiff cites (including *WM Int'l, Inc.* and *Peek &*

*Cloppenburg KG*) are "distinguishable" and that the allegations are more analogous to ones

rejected as conclusory in *OSF Int'l, Inc. v. Spellicy*, No. 23-cv-13, 2023 WL 6599087, at *6–7,

2023 U.S. Dist. LEXIS 181609, at *17–21 (N.D.N.Y. Oct. 10, 2023) and *CDC Newburgh Inc*,

692 F. Supp. 3d at 226. (*See* Dkt. No. 24, at 6–9). But Defendant is not entirely clear on how

Plaintiff's allegations specifically fall short,[6] and Plaintiff's allegations are not like those rejected

in *OSF Int'l*, where the court specifically noted that the plaintiff had failed to plead that the

defendant was aware of the plaintiff's mark, 2023 WL 6599087, at *7, 2023 U.S. Dist. LEXIS

---

[6] Defendant underlines reproduced parts of both *WM Int'l Inc.* and *Peek & Cloppenburg KG* referencing "intentional copying" and marks that are "so close as to infer copying," suggesting that these facts have not been alleged here. (Dkt. No. 24, at 6–7). But as discussed, Plaintiff has pleaded facts indicating both knowledge and similarity, which those cases note is all that is needed at this stage.

181609, at *21, or in *CDC Newburgh*, where the allegations of bad faith rested on an entirely different theory than the one asserted here, *see* 692 F. Supp. 3d at 226.

Accordingly, the Court denies Defendant's motion to dismiss Plaintiff's claim of unfair competition on the basis that Plaintiff failed to allege a theory of misappropriation.

### c.     Special Damages

Defendant also argues that Plaintiff's unfair competition claim "fails because it does not allege special damages," (Dkt. No. 10-1, at 9–10), to which Plaintiff responds that "[s]pecial damages generally are not a required element for unfair competition claims, particularly those based upon misappropriation of trademarks," (Dkt. No. 22, at 16).

"Under New York common law, the standards for trademark infringement and unfair competition are 'virtually identical' to the standard under the Lanham Act, 'except that [New York law] requires an additional showing of bad faith.'" *CDC Newburgh Inc.*, 692 F. Supp. 3d at 229 (citation omitted). Special damages are not an element of unfair competition claims under the Lanham Act. *See Int'l Diamond Imps., Inc. v. Oriental Gemco (N.Y.), Inc.*, 64 F. Supp. 3d 494, 524 (S.D.N.Y. 2014) ("An unfair competition claim under the Lanham Act requires a showing of 'a valid trademark entitled to protection under the Act, and (2) defendant's actions are likely to cause confusion.'" (citation omitted)). Injunctive relief, as requested here, has been sought and awarded in other trademark-based unfair competition claims without requiring a showing of special damages. *See, e.g.*, *U.S. Polo Ass'n, Inc. v. PRL USA Holdings, Inc.*, 800 F. Supp. 2d 515, 538–42 (S.D.N.Y. 2011) (awarding permanent injunction to party prevailing on Lanham Act claim and New York common law unfair competition claim), *aff'd*, *U.S. Polo Ass'n, Inc. v. PRL USA Holdings, Inc.*, 511 Fed. App'x. 81 (2d Cir. 2013); *The Am. Auto. Ass'n (Inc.) v. AAA Auto. Club of Queens, Inc.*, No. 97-cv-1180, 1999 WL 97918, at *9, 1999 U.S. Dist. LEXIS 8892, at *29 (E.D.N.Y. Feb. 8, 1999) (same); *see also Ellington v. Harbrew Imps. Ltd.*, 812 F.

Supp. 2d 186, 193, 194–95 (E.D.N.Y. 2011) (adopting Magistrate Judge's recommendation to award injunctive relief to plaintiff prevailing on unfair competition claims under both the Lanham Act and New York common law even though the court found the plaintiff failed to establish actual damages).

Accordingly, the Court denies Defendant's motion to dismiss Plaintiff's claim of unfair competition on the basis that Plaintiff did not allege special damages.

### 2. New York General Business Law Sections 349, 350, and 360-l

#### a. Statute of Limitations

Defendant argues that "the allegedly injurious conduct" described in the complaint "began far more than three years ago," and therefore that Plaintiff's claims based on violations of the New York General Business Law are barred by the statute of limitations. (Dkt. No. 10-1, at 10–11). Plaintiff responds that these claims are not barred because trademark dilution is a continuing tort and thus it "is entitled to relief based upon Defendant's actions in the three years prior to the filing of [its] [c]omplaint," (Dkt. No. 22, at 18) and because all three claims accrued in 2022 under a theory of progressive encroachment, (*id.* at 18–19, 24–25). Defendant does not directly contest either of Plaintiff's theories of timeliness: it asks that "to the extent [Plaintiff] seeks relief for activities outside the statute of limitations, its claims should be dismissed." (Dkt. No. 24, at 11–12).

"While a statute-of-limitations defense may be raised in a motion to dismiss under [Rule] 12(b)(6), such a motion should not be granted unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Clement v. United Homes, LLC*, 914 F. Supp. 2d 362, 369 (E.D.N.Y. 2012) (quoting *Ortiz v. Cornetta*, 867 F.2d 146, 148 (2d Cir. 1989)). Defendant's current position is not that Plaintiff's claims under the New York General Business Law are barred by the statute of limitations, but rather, that

14

Plaintiff should not be able to seek relief for activities occurring outside of them. This is therefore not an issue of whether Plaintiff's claims are time barred, but instead relates to the scope of potential damages Plaintiff may eventually seek.[7]

Accordingly, the Court denies Defendant's motion to dismiss Plaintiff's claims under the New York General Business Law on the basis that the claims are time barred.

### b.    Federal Preemption

Defendant argues that the Lanham Act bars Plaintiff's claim for trademark dilution under N.Y. Gen. Bus. Law § 360-1. (Dkt. No. 10-1, at 11–12). Plaintiff responds that its claim is not preempted because it is based on Defendant's "unregistered use of EMPOWER," "federal preemption only applies to any dilution as a result of the use of a validly registered trademark which is asserted as the basis for dilution," and Defendant "cannot claim preemption based upon its registered trademarks because Plaintiff is currently challenging the validity of a majority of such marks." (Dkt. No. 22, at 20–23).

15 U.S.C. § 1125(c)(6) provides "a complete bar" to certain actions against the owner of a valid trademark registration "with respect to that mark." The barred actions include those that are brought under state law that "seek[] to prevent dilution by blurring or dilution by tarnishment." *Id.* § 1125(c)(6)(A)–(B)(i). Plaintiff is correct that this provision only applies to marks with valid trademark registrations, and therefore it is free to assert a dilution claim with respect to any unregistered marks. *See MetLife, Inc. v. Metro. Nat'l Bank*, 388 F. Supp. 2d 223,

---

[7] Courts have noted in trademark cases involving claims of continuing torts that statutes of limitations bar the scope of damages, not the availability of relief. *See De Medici v. Lorenzo de Medici, Inc.*, 475 N.Y.S.2d 391, 393 (App. Div. 1st Dep't 1984) (finding that because trademark infringement and trademark dilution are continuing torts, "the statute of limitations has not run on either cause of action," but that "even under a continuing tort theory, recovery in damages" is limited by the statute of limitations"); *Gucci Am. Inc. v. Guess?, Inc.*, 868 F. Supp. 2d 207, 246 (S.D.N.Y. 2012) (explaining in a case asserting trademark infringement under federal law that because "trademark infringement is a 'continuing wrong,' the statute of limitations defense only applies to bar monetary recovery beyond the statutory period, and does not limit the availability of injunctive relief.")

236 (S.D.N.Y. 2005) (finding that action based on unregistered trademark was not preempted by registration of company's trademark). Defendant's motion to dismiss therefore must be denied to the extent Plaintiff seeks to base its dilution claim on the unregistered use of EMPOWER.

It is not entirely clear from Plaintiff's complaint or response brief whether it intends to assert claims of state trademark dilution based on Defendant's registered trademarks. Plaintiff states that Defendant's "unregistered use of EMPOWER is the basis for" its state dilution claim, (Dkt. No. 22, at 20), but proceeds to argue that it can assert state dilution claims based on registered trademarks, (*id.* at 21–23). To the extent that Plaintiff is arguing that it can challenge the use of any of Defendant's registered trademarks related to capacities that the registrations did not cover, such as banking, (*see id.* at 21), Defendant is correct that Plaintiff does not cite any case law in support of this proposition, (*see* Dkt. No. 24, at 12; *see also* Dkt. No. 22, at 21–23). Moreover, as Defendant points out, 15 U.S.C. § 1125(c)(6) creates a federal bar applicable not to the registration but to the mark itself. (Dkt. No. 24, at 12).

However, Plaintiff also argues that "Defendant cannot claim preemption based upon its registered trademarks because Plaintiff is currently challenging the validity of a majority of such marks," stating "a strong majority of courts throughout the country have held that 15 U.S.C. § 1125(c)(6) is not a basis for dismissal where the plaintiff is concurrently challenging the validity of the mark(s) at issue." (Dkt. No. 22, at 21–22). Defendant notes that "other courts have held that even challenged registrations should operate as a bar if the statute is to have its intended effect." (Dkt. No. 24 at 12).

The Second Circuit has not addressed whether a plaintiff can bring a state dilution claim against a registered trademark if it is concurrently challenging the validity of that trademark. However, "the majority of federal courts that have addressed the issue," "refuse[d] to dismiss

state dilution claims in the early stages of litigation when there is a concurrent challenge to the validity of the trademark at issue." *See Mott's LLP v. Comercializadora Eloro, S.A.*, 507 F. Supp. 3d 780, 786–87 (W.D. Tex. 2020) (collecting cases). As stated in *Mott's LLP*, "'it is more efficient to decide this [state law] claim now, rather than requiring plaintiffs to return to litigate this [state] claim' after the defendant's mark is cancelled." *Id.* (quoting *Sanofi-Aventis v. Advancis Pharm. Corp.*, 453 F. Supp. 2d 834, 854 n.10 (D. Del. 2006)). The Court agrees with that caselaw.

Here, the complaint seeks the cancellation of eleven of Defendant's currently registered trademarks. (Dkt. No. 1, ¶¶ 118–26). Consequently, it would be proper for Plaintiff to proceed with its state dilution claim based on any mark that it is currently challenging (along with any of Defendant's unregistered marks). Accordingly, the Court denies Defendant's motion to dismiss Plaintiff's state trademark dilution claim on the basis that the claim is federally preempted.

### c.    Public Harm

Defendant moves to dismiss Plaintiff's claims of deceptive trade practices and unfair competition under, respectively, Sections 349 and 350 of the New York General Business Law, on the basis that Plaintiff has failed to plead a harm to the public beyond "ordinary trademark infringement." (Dkt. No. 10-1, at 12–14). Plaintiff argues that it "pleaded in its [c]omplaint that Defendant's actions have caused and will continue to cause harm to the public at large." (Dkt. No. 22, at 24 (citing Dkt. No. 1, ¶¶ 147, 149)). Plaintiff also points to an event described in the complaint wherein a transfer request involving one of Defendant's customers revealed "sensitive personal information, including . . . the consumer's name, social security number and account value" to "a party unauthorized to receive such information." (*Id.* (quoting Dkt. No. 1, ¶ 72)).

Section 349(a) prohibits deceptive trade practices and Section 350 prohibits false advertising.[8] "Because sections 349 and 350 are consumer protection statutes, a plaintiff may state a claim under these statutes only if it asserts 'consumer injury or harm to the public interest.'" *Perkins Sch. for the Blind v. Maxi-Aids, Inc.*, 274 F. Supp. 2d 319, 327 (E.D.N.Y. 2003) (citations omitted). "[C]ourts in New York have routinely dismissed trademark claims brought under Sections 349 and 350 as being outside the scope of the statutes, because ordinary trademark disputes do not 'pose a significant risk of harm to the public health or interest' and are therefore not the type of deceptive conduct that the statutes were designed to address." *Kaplan, Inc.*, 16 F. Supp. 3d at 352 (quoting *DePinto v. Ashley Scott, Inc.*, 635 N.Y.S.2d 215, 217 (1995)); *see also DO Denim, LLC, v. Fried Denim, Inc.*, 634 F. Supp. 2d 403, 409, (S.D.N.Y. 2009) ("[B]ecause 'section 349 is modelled after the Federal Trade Commission Act, federal courts have interpreted the statute's scope as limited to the types of offenses to the public interest that would trigger Federal Trade Commission intervention under 15 U.S.C. § 45.'" (citation omitted)).

The Court agrees with Defendant that the described "one-off incident is not 'the type of direct and broad harm to consumers or the general public' that is meant to be redressed by" the specified provisions. (Dkt. No. 24, at 14 (quoting *Boarding Sch. Rev., LLC v. Delta Career Educ. Corp.*, No. 11-cv-8921, 2013 WL 6670584, at *6, 2013 U.S. Dist. LEXIS 48513, at *19 (S.D.N.Y. Mar. 29, 2013))). The type of harm alleged here—a customer providing information to the wrong entity—is at its heart still an instance of consumer confusion, albeit in the financial space. *See Sports Traveler, Inc. v. Advance Mag. Publishers*, No. 96-cv-5150, 1997 WL 137443,

---

[8] "Claims under Section 349 and Section 350 are similar: in order to state a claim under either provision, 'a plaintiff must allege that a defendant has engaged in (1) consumer-oriented conduct that is (2) materially misleading and that (3) plaintiff suffered injury as a result of the allegedly deceptive act or practice.'" *Kaplan, Inc. v. Yun*, 16 F. Supp. 3d 341, 352 (S.D.N.Y. 2014) (quoting *Koch v. Acker, Merrall & Condit Co.*, 944 N.Y.S.2d 452, 452 (2012)).

at *3, 1997 U.S. Dist. LEXIS 3403, at *7–8 (S.D.N.Y. Mar. 24, 1997) ("The courts of this Circuit have held that trademark infringement actions alleging only general consumer confusion do not threaten the direct harm to consumers that is required to state a claim under section 349.").[9]

Accordingly, the Court grants Defendant's motion to dismiss Plaintiff's Section 349 and Section 350 claims on the basis that Plaintiff failed to allege public harm within the meaning of the statute.

### 3.    Leave to Amend

Plaintiff seeks leave to replead under Rule 15(a)(2) of the Federal Rules of Civil Procedure in the event any of its claims are found insufficient. (Dkt. No. 22, at 25). Defendant opposes Plaintiff's request because Plaintiff "has not even attempted to show what additional facts it would plead if given the opportunity, much less that additional allegations would cure the deficiencies in its complaint." (Dkt. No. 24, at 14).

"The Second Circuit 'strongly favors liberal grant of an opportunity to replead after dismissal of a complaint under Rule 12(b)(6),'" *In re Bystolic Antitrust Litigation*, 583 F. Supp. 3d 455, 496 (S.D.N.Y. 2022) (quoting *Porat v. Lincoln Towers Cmty. Ass'n*, 464 F.3d 274, 276 (2d Cir. 2006), *aff'd sub nom. Watson Laboratories, Inc.*, 101 F.4th 223 (2d Cir. 2024); *see also* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave [to amend pleadings] when justice so requires."). While it is true that Plaintiff has not asserted what additional facts it may plead if provided the opportunity, it appears possible for Plaintiff to correct the complaint's deficiencies

---

[9] Plaintiff's citation, (Dkt. No. 22, at 23), to *Actava TV, Inc. v. Joint Stock Co. "Channel One Russ. Worldwide,"* 412 F. Supp. 3d 338, 353 (S.D.N.Y. 2019), where the court found allegations that the defendant's actions had led to "reduced competition in the market" to sufficiently plead public harm, illustrates the type of allegations necessary to rise above "mere consumer confusion."

with better pleading. The Court grants Plaintiff's request to amend the complaint; if it chooses to amend it must file an amended complaint within twenty-one days of this Order.

### C.    Plaintiff's Motion to Dismiss Counterclaims

Plaintiff has moved to dismiss under Rule 12(b)(6) Defendant's counterclaims for cancellation of the Word Mark Registration for EMPOWER FEDERAL CREDIT UNION, and the Design Mark Registration for . (Dkt. Nos. 46, 46-1). Plaintiff argues that Defendant has failed to sufficiently allege a claim for trademark cancellation due to abandonment, fraud upon the USTO, or lack of intent-to-use. (Dkt. No. 46-1).

### 1.    Matters Outside the Pleadings

In its motion to dismiss the amended counterclaims Plaintiff cites to the webpage of the NCUA. (Dkt. No. 46-1, at 7–8). Defendant cites to "materials outside the pleadings," (Dkt. No. 48, at 7), and has attached twenty-eight exhibits to its response brief, (*see* Dkt. No. 48-1–48-28). These exhibits appear to be: documents regarding the registrations of the Word and Design Marks, (*see* Dkt. Nos. 48-1–48-15); an image from Plaintiff's website, (*see* Dkt. No. 48-16); Plaintiff's business records, (*see* Dkt. Nos. 48-17–48-22); counsel correspondence, (*see* Dkt. Nos. 48-23–48-26, 48-28); and a screenshot of the NCUA's website, (*see* Dkt. No. 48-27).

"Generally, consideration of a motion to dismiss under Rule 12(b)(6) is limited to consideration of the complaint itself," *Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006), and "documents attached to the complaint as exhibits," *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010). However, considering "materials outside the complaint is not entirely foreclosed on a 12(b)(6) motion." *Faulkner*, 463 F.3d at 134. A complaint "is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 230 (2d Cir. 2016) (quoting

*Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002)). "Where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, thereby rendering the document integral to the complaint." *Nicosia*, 834 F.3d at 230 (internal quotation marks omitted) (quoting *DiFolco*, 622 F.3d at 111). Even where a document is integral to the complaint, it must be "clear" that "no dispute exists regarding the authenticity or accuracy of the document" and that "there exist no material disputed issues of fact regarding the relevance of the document." *Faulkner*, 463 F.3d at 134. "[I]f material is not integral to or otherwise incorporated in the complaint, it may not be considered unless the motion to dismiss is converted to a motion for summary judgment and all parties are 'given a reasonable opportunity to present all the material that is pertinent to the motion.'" *Nicosia*, 834 F.3d at 231 (quoting Fed. R. Civ. P. 12(d)).

Additionally, pursuant to Rule 201 of the Federal Rules of Evidence, a "court may judicially notice a fact that is not subject to reasonable dispute," where it "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)–(b)(2). "[M]atters judicially noticed by the District Court are not considered matters outside the pleadings." *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 426 (2d Cir. 2008) (citation omitted). On a motion to dismiss under Rule 12(b)(6), "the Court may take judicial notice of certain matters of public record without converting the motion into one for summary judgment." *Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC*, 127 F. Supp. 3d 156, 166 (S.D.N.Y. 2015).

### a.    NCUA Website

Plaintiff's brief in support of its motion to dismiss refers to the NCUA website as listing Plaintiff's charter number as 3025, reproduces part of an image of the page stating that information and provides the link to that page. (Dkt. No. 46-1, at 7–8). Plaintiff indicates that the

Court can take judicial notice of the website. (*Id.* at 8 n.2). In response Defendant argues that the NCUA website "is not integral to allegations of the counterclaims," and questions how it sources its information. (*See* Dkt. No. 48, at 27).[10]

Courts may take judicial notice of government websites and the information contained within them. *See, e.g.*, *Crespo v. S.C. Johnson & Son, Inc.*, 394 F. Supp. 3d 260, 266 n. 3 (E.D.N.Y. 2019) (taking "judicial notice of the EPA website and the documents maintained on that site" in evaluating a motion to dismiss); *Perez v. Ahlstrom Corp.*, No. 10-cv-1299, 2011 WL 2533801, at *2, 2011 U.S. Dist. LEXIS 68411, at *7 (D. Conn. June 27, 2011) (stating that on a motion to dismiss "the court may also properly consider 'matters of which judicial notice may be taken,' including information on an official government website" (citations omitted)).

While Defendant acknowledges that the NCUA website is a "government website," Defendant questions how the information in that website was assembled or maintained and what inferences can be drawn from its contents. (*See* Dkt. No. 48, at 27). "[C]ourts generally consider government websites as sources 'whose accuracy cannot reasonably be questioned' for purposes of [Fed. R. Evid.] 201(b)." *Harris v. U.S. Secret Serv.*, 605 F. Supp. 3d 410, 413 (N.D.N.Y. 2022) (citing *Wells Fargo Bank, N.A.*, 127 F. Supp. 3d at 166). The Court will therefore take judicial notice of the NCUA website and specifically the fact that it lists Plaintiff's charter number as 3025.

**b.    Word and Design Mark Documents**

Defendant's first fifteen exhibits to its response brief appear to be documents that were filed with or issued by the USPTO related to Plaintiff's Word and Design Marks. (*See* Dkt. Nos.

---

[10] At the same time Defendant attaches what appears to be a screenshot of the NCUA website as its own exhibit. (*See* Dkt. No. 48-27).

22

48-1–48-15; *see also* Dkt. No. 48, at 9–12). While Defendant does not explicitly state why these documents may be considered on this motion to dismiss, Plaintiff does not specifically contest the relevance or authenticity of these documents.

Some of these documents, (Dkt. Nos. 48-1, 48-3, 48-4,[11] 48-6, 48-9, 48-12, 48-13, 48-15), appear to be referenced in Defendant's amended counterclaims, (*see* Dkt. No. 40, ¶¶ 49–53, 59–63). Because Defendant "relies heavily upon [their] terms and effect" to frame its pleadings, the Court finds them integral to the counterclaims and the Court will consider them. *See Nicosia*, 834 F.3d at 230 (citation omitted). The rest of these documents, which the Court finds have not been incorporated within nor integral to the counterclaims, will not be considered.

### c.     Plaintiff's Website

Defendant's Exhibit 16 appears to be a screenshot of Plaintiff's website, also provided without explicit argument as to why the Court may consider it.[12] Defendant provides no references to the website in its amended counterclaims, nor does it appear to rely on any information therein. (*See* Dkt. No. 40). However, "[f]or purposes of a 12(b)(6) motion to dismiss, a court may take judicial notice of information publicly announced on a party's website, as long as the website's authenticity is not in dispute and 'it is capable of accurate and ready determination.'" *Wells Fargo Bank, N.A.*, 127 F. Supp. 3d at 167 (quoting *Doron Precision Sys., Inc. v. FAAC, Inc.*, 423 F. Supp. 2d 173, 179 n.8 (S.D.N.Y. 2006)). At the same time, it cannot rely on it for the truth of any facts contained on the website. *Hesse v. Godiva Chocolatier, Inc.*, 463 F. Supp. 3d 453, 463 (S.D.N.Y. 2020) (explaining certain documents, including pages on the defendant's website, "may be used only for determining what the documents state" and cannot

---

[11] Dkt. No. 48-4 is also the same document as Dkt. No. 1-1, at 4–5, and thus can be considered as an exhibit to the complaint.

[12] Defendant refers to the contents of the website as "publicly available statements." (*See* Dkt. No. 48, at 14–15).

be relied on "to prove the truth of their contents" (internal quotation marks and citations omitted)).

Here, Plaintiff does not object to the authenticity of the website. (*See* Dkt. No. 51, at 9). The Court therefore takes judicial notice of the fact that certain statements were posted on Plaintiff's website, but not of the truth of those statements.

### d.    Business Records and Counsel Correspondence

Defendant's Exhibits 17 through 22 are Plaintiff's business records that that appear to have been produced to Defendant in discovery. (*See* Dkt. Nos. 48-17–48-22; *see also* Dkt. No. 48, at 15–18 (referring to these documents as "recently produced"), 28). Exhibits 23, 24, 25, 26, and 28 appear to be correspondence between the parties' counsel regarding discovery matters. (*See* Dkt. Nos. 48-23–48-26, 48-28; *see also* Dkt. No. 48, at 18–19, 29). Defendant does not provide a reason why the Court could appropriately consider such documents on a motion to dismiss, and the Court cannot ascertain any that could apply. The Court therefore does not consider these Exhibits.

### 2.    Word and Design Mark Cancellation

"A registered mark becomes incontestable if it has been in continuous use for five consecutive years subsequent to its registration and is still in use." *Gruner + Jahr USA Pub., a Div. of Gruner + Jahr Printing & Pub. Co. v. Meredith Corp.*, 991 F.2d 1072, 1076 (2d Cir. 1993) (citing 15 U.S.C. § 1065). An incontestable trademark may only be cancelled "subject to the specific permissible grounds for cancellation of an incontestable trademark in 15 U.S.C. § 1064 and the defenses to incontestability status in 15 U.S.C. § 1115(b)." *Ferring B.V. v. Fera Pharmaceuticals, LLC*, No. 13-cv-4640, 2014 WL 4829458, at *2 (E.D.N.Y. Sept. 29, 2014).

Defendant does not appear to challenge that Plaintiff's Word and Design Marks are incontestable. (*See* Dkt. No. 40, ¶¶ 112, 119; Dkt. No. 48).

### a.  Abandonment

Plaintiff states that Defendant has "not pleaded facts showing non-use of Plaintiff's marks" or "facts showing lack of intent by Plaintiff to resume or use the marks in the future." (Dkt. No. 46-1, at 16). Defendant responds that it "alleges that the legal owner of the [Word and Design Mark] Applications and their subsequent registrations was and is Power FCU," (Dkt. No. 48, at 22 (citing Dkt. No. 40, ¶¶ 45–46, 51, 55, 72–73, 78–81, 109, 113, 116)), and that it "alleges that Power FCU never used the marks, never intended to use the marks, and has no intent to resume the use of the marks," (*id.* at 22–23 (citing Dkt. No. 40, ¶¶ 82–83, 110–11, 117–18)).

"The Lanham Act provides that a petition to cancel a trademark registration may be filed 'at any time' if, *inter alia*, the registered mark has been abandoned." *Emmpresa Cubana Del Tabaco v. Culbro Corp*, 213 F. Supp. 2d 247, 266 (S.D.N.Y. 2002) (citing 15 U.S.C. § 1064(3)). If "an owner ceases to use a mark without an intent to resume use in the reasonably foreseeable future, the mark is said to have been 'abandoned.'" *ITC Ltd v. Punchgini, Inc.*, 482 F.3d 135, 147 (2d Cir. 2007) (citing *Silverman v. CBS, Inc.*, 870 F.2d 40, 45 (2d Cir. 1989)). "To determine that a trademark or trade name is abandoned, two elements must be satisfied: non-use of the name by the legal owner and no intent by that person or entity to resume use in the reasonably foreseeable future." *Privado Mktg. Grp. LLC v. Eleftheria Rest Corp.*, No. 13-cv-3137, 2014 WL 3377107, at *7, 2014 U.S. Dist. LEXIS 91658, at *26 (S.D.N.Y. July 7, 2014) (quoting *Stetson v. Howard D. Wolf & Assocs.*, 955 F.2d 847, 850 (2d Cir. 1992)). "Nonuse for 3 consecutive years shall be prima facie evidence of abandonment." 15 U.S.C. § 1127. Defendant alleges that "[a]ccording to the Trademark Status & Document Retrieval (TSDR), the Trademark Electronic Search System

(TESS), and the face of the Registration Certificate," Power FCU is the owner of the Word Mark Registration. (*See* Dkt. No. 40, ¶ 45). Defendant further alleges that Power FCU, "abandoned the [] Word Mark by discontinuing for more than three years and/or never using the [] Word Mark in connection with the goods and services identified in the [] Word Mark Registration." (Dkt. No. 40, ¶ 110). This is sufficient to allege abandonment.

Plaintiff argues that "Defendant's abandonment claims are based solely on its facially incorrect assertion that Plaintiff did not file the initial applications for its registrations"; Plaintiff argues that "Plaintiff was, and always has been, the owner of its applications and registrations at issue." (Dkt. No. 46-1, at 16). While the Court has taken judicial notice of the fact that Plaintiff and Power FCU have the same charter number, (*see id.* at 7–8), Plaintiff does not provide any citation to indicate that Power FCU and Plaintiff are considered legally the same for purposes of trademark ownership.[13] Moreover, Plaintiff both pleads and presents documents that indicate Plaintiff continued to submit documents stating Power FCU was the owner of the Word Mark between 2013 and 2022. (*See* Dkt. No. 40, ¶¶ 49, 52, 53; Dkt. Nos. 48-1, 48-6, 48-9).

With respect to the Design Mark, Defendant alleges that "[a]ccording to the TSDR, the TESS, and the face of the Registration Certificate," Plaintiff is the owner of the Design Mark Registration. (Dkt. No. 40, ¶ 54). Given these allegations,[14] Defendant cannot then state Power FCU, a non-owner, abandoned the mark and thus has failed to state a claim of cancellation based on abandonment of the Design Mark.

---

[13] Defendant, citing the Trademark Manual of Examining Procedure, suggests that the two entities may not be the same. (Dkt. No. 48, at 6 ("Under relevant USPTO rules, '[a] merger of companies into a new company,' like that which [Plaintiff] alleges occurred here, 'normally constitutes a change of legal entity.'" (citing TMEP § 1604.07(d)))).

[14] Additionally, because Plaintiff' Design Mark is incontestable, "the registration shall be conclusive evidence . . . of the registrant's ownership of the mark." 15 U.S.C. 1115(b).

b.      Fraud

In addressing Defendant's allegations that Plaintiff committed fraud on the USPTO,

Plaintiff argues that Defendant's pleadings failed to comply with the heightened pleading

standards of Rule 9(b) of the Federal Rules of Civil Procedure, including, among other

deficiencies, by failing to specify the allegedly fraudulent statements made. (Dkt. No. 46-1, at

17–19). Defendant argues that it "specifically alleges numerous false, material representations

made in connection with the [Word and Design Mark] Applications and their subsequent

registrations based upon which an intent to deceive the USPTO can be inferred," and provides

theories for why certain submissions to the USPTO were fraudulent.  (Dkt. No. 48, at 23–24).

"Under the Lanham Act, 'any person who believes that he is or will be damaged' may

file a 'petition to cancel a registration of a mark,' for which 'registration was obtained

fraudulently.'" *MPC Franchise, LLC v. Tarntino*, 826 F.3d 653, 658 (2d Cir. 2016) (quoting 15

U.S.C. § 1064(3)). "The party seeking cancellation on the basis of fraud must establish that the

registrant misrepresented a material fact, that the registrant knew or should have known that its

representation was false, that the registrant intended to induce the [US]PTO to act in reliance

thereon, that the [US]PTO reasonably relied on the misrepresentation, and that damages

proximately resulted from that reliance." *Privado Mktg. Grp. LLC*, 2014 WL 3377107, at *6,

2014 U.S. Dist. LEXIS 91658, at *23 (quoting *Patsy's Italian Rest., Inc. v. Banas*, 658 F.3d 254,

270–71 (2d Cir. 2011)).

In making such a claim for mark cancellation based on fraudulent obtainment, the "party

must also satisfy the pleading requirements of Rule 9(b)." *A.V.E.L.A., Inc v. Est. of Marilyn

Monroe, LLC*, 241 F. Supp. 3d 461, 480 (S.D.N.Y. 2017) (citing *Kash 'N Gold, Ltd v. Samhill

Corp.*, No. 90-cv-1097, 1990 WL 196089, at *1–3, 1990 U.S. Dist. LEXIS 15935, at *1–11

(S.D.N.Y. Nov. 29, 1990)); *see also* Fed. R. Civ. Pro. 9(b) ("In alleging fraud or mistake, a party

must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."). To comply with Rule 9(b), a party asserting a claim of fraud "must: (1) specify the statements that the [party] contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir. 2006) (quoting *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993)).

In its counterclaims, Defendant alleges that "[t]he identification of Power FCU as the owner of the [] Word Mark [and Design Mark] and the subsequent statements during prosecution and post-registration," specified in paragraphs 6, 9, 12, 13, 15, 18, 20–24, 27–28, "were false and material statements made with the intent to deceive the USPTO and without which the [] Word Mark Registration[15] would not have been registered and/or maintained on the register or found to be incontestable." (Dkt. No. 40, at ¶¶ 112, 119). But none of the listed paragraphs contain *any* specific statements made by Plaintiff, and thus Defendant's claim cannot meet the pleading requirements of Rule 9(b). In its response to Plaintiff, Defendant states that it made "typographical errors" and intended to cite different paragraphs, and then uses these new paragraphs to argue it has stated a claim for cancellation due to fraud. (Dkt. No. 48, at 25 n.1; *see id.* at 23–24). But "[i]t is well-settled that a plaintiff cannot amend his pleadings through statements in his brief." *Zuchegno v. FQSR, LLC*, 600 F. Supp. 3d 279, 285 (W.D.N.Y. 2022) (citing *Fadem v. Ford Motor Co.*, 352 F. Supp. 2d 501, 516 (S.D.N.Y. 2005)).[16]

---

[15] Defendant states in paragraph 119 of its amended counterclaims that the alleged "false and material statements" were ones "without which the [] *Word* Mark Registration would not have been registered/maintained on the register or found to be incontestable." (Dkt. No. 40, ¶ 119) (emphasis added). This appears to be a typographical error, as the specific counterclaim is otherwise referencing the Design Mark and Design Mark Application. (*See id.* ¶¶ 116–20).

[16] Plaintiff additionally notes that it previously called attention to the fact that the paragraphs Defendant named as containing fraudulent statements did not contain any statements made by Plaintiff, in its first motion to dismiss, before

### c.        Lack of Intent-to-Use

Plaintiff argues both that Defendant "is not even permitted to bring a claim for

cancellation of Plaintiff's trademarks on the basis of a lack of an intent-to-use because the

registrations are incontestable" and that "even if such a defense could be raised, such a defense is

not plausible or supported by facts." (Dkt. No. 46-1, at 16–17). Defendant does not respond to

these arguments in its response brief and consequently the Court deems the claim abandoned.

*See Fantozzi v. City of New York*, 343 F.R.D. 19, 32 (S.D.N.Y. 2022) ("Courts may, and

generally will, deem a claim abandoned when a plaintiff fails to respond to a defendant's

arguments that the claim should be dismissed." (internal quotation marks omitted) (quoting *Felix

v. City of New York*, 344 F. Supp. 3d 644, 654 (S.D.N.Y. 2018))).

 Accordingly, the Court finds that Defendant's fourth counterclaim for the cancellation of

the Word Mark survives under a theory of abandonment and Defendant's fifth counterclaim for

the cancellation of the Design Mark is dismissed.

## IV.     MOTION TO STRIKE

Defendant filed an answer in response to the parts of Plaintiff's complaint that Defendant

does not seek to dismiss and included seven affirmative defenses. (Dkt. No. 28). Plaintiff has

moved to strike six of those defenses under Rule 12(f) of the Federal Rules of Civil Procedure on

the basis that "they are duplicative, not legally cognizable and/or rely heavily upon heavily

inadmissible information." (Dkt. No. 35).

### A.      Legal Standard

Under Rule 12(f), "[t]he court may strike from a pleading an insufficient defense or any

redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). "In making its

---

Defendant amended its counterclaims. (Dkt. No. 51, at 12 n.4; *see also* Dkt. No. 35-1, at 19–20). Defendant did not
ask for leave to file another amendment to its counterclaims and therefore the Court has not considered that issue.

determination on a Rule 12(f) motion, a court 'must accept the matters well-pleaded as true and should not consider matters outside the pleadings.'" *Emps. Ins. Co. of Wausau v. Crouse-Cmty. Ctr., Inc.*, 489 F. Supp. 2d 176, 179 (N.D.N.Y. 2007) (quoting *Cnty. Vanlines, Inc. v. Experian Info. Solutions, Inc.*, 205 F.R.D. 148, 152 (S.D.N.Y. 2002)). "Federal Courts have discretion in deciding whether to grant motions to strike." *Holland v. Chase Bank USA, N.A.*, 475 F. Supp. 3d 272, 275 (S.D.N.Y. 2020) (quoting *Capri Sun GmbH v. Am. Beverage Corp.*, 414 F. Supp. 3d 414, 423 (S.D.N.Y. 2019)).  At the same time, "[m]otions to strike under Rule 12(f) are generally disfavored and granted only if there is strong reason to do so." *Kochan v. Kowalski*, 478 F. Supp. 3d 440, 450 (W.D.N.Y. 2020) (citation omitted).

In *GEOMC Co. v. Calmare Therapeutics Inc.*, the Second Circuit examined the factors to consider when striking an affirmative defense. 918 F.3d 92, 95–99 (2d Cir. 2019). First, the affirmative defense must meet "the plausibility standard of *Twombly*." *Id.* at 98. Determining if this standard is met is a "'context-specific' task." *Id.* Relevant "to the degree of rigor appropriate for testing the pleading of an affirmative defense," is the relatively shorter timeframe a defendant has to file an answer compared with a plaintiff's time to file a complaint. *Id.* Additionally, "the relevant context will be shaped by the nature of the affirmative defense" as the facts of some defenses will be more readily available than others. *Id.* Second, "an affirmative defense is improper and should be stricken if it is a legally insufficient basis for precluding a plaintiff from prevailing on its claims." *Id.* Third, an "otherwise valid affirmative defense" may be dismissed on the basis that it prejudices the plaintiff, but this decision "will normally depend on when the defense is presented." *Id.* If the defense is timely filed (and otherwise "factually sufficient and legally valid"), the "defense should always be allowed." *Id.*

30

B.       Objections[17]

1.       First Affirmative Defense (Laches)

Plaintiff asserts two objections to Defendant's first affirmative defense of laches. One of

these objections is that Defendant's first affirmative defense is duplicative of Defendant's

seventh affirmative defense.[18] (Dkt. No. 35-1, at 25; Dkt. No. 43, at 5–6). The first affirmative

defense is based on the theory that Plaintiff knew of Defendant's use of Empower branding since

2014 but waited to challenge the use of Empower-formative marks, prejudicing Defendant. (*See*

Dkt. No. 28, at 58–59). Defendant's seventh affirmative defense, while referencing laches, also

invokes the statute of limitations. (*See id.* at 64). Because these defenses potentially assert

different legal theories—one based on equitable principles and one based on statute—the Court

will not strike this defense as duplicative.

Plaintiff's other objection is that this affirmative defense contains "statements made by

the Plaintiff in 2007 during prosecution of its trademark application before the USPTO" and

those statements "fail to satisfy the basic *Iqbal/Twombly* standard as they do not support or plead

facts supporting a laches defense." (Dkt. No. 43, at 6; *see also* Dkt. No. 35-1, at 25). Defendant

appears to assert that its allegation that Plaintiff "recognized as early as 2007, when it made its

USPTO statements, that there was no likelihood of confusion between its use of its marks and

the use of similar marks by other types of financial institutions . . . help[s] establish that

---

[17] Plaintiff initially argued that Defendant's "first, second, fourth, fifth and sixth affirmative defenses improperly charge judicial estoppel." (Dkt. No. 35-1, at 21). Defendant denies that it is asserting judicial estoppel, but rather that it is relying on statements Plaintiff made to the USPTO in 2007 "to provide further support to elements of its [a]ffirmative [d]efenses." (Dkt. No. 39, at 16–17). Plaintiff argues in reply that "Defendant cannot base any of its affirmative defenses" on the 2007 statements Plaintiff made to the USPTO but Plaintiff does not cite any case law for that proposition. (Dkt. No. 43, at 12–13). Because Defendant does not plead any affirmative defense dependent on judicial estoppel, the Court does not evaluate the issue further.

[18] Defendant does not respond to Plaintiff's assertion that its first and seventh affirmative defenses are duplicative. (*See* Dkt. No. 39).

[Plaintiff] inexcusably delayed asserting its claims for nearly a decade." (Dkt. No. 39, at 17). Defendant also notes that the objected to "statements make up only a part of the grounds on which [Defendant] relies" with respect to this defense and others. (*Id.* at 20).

To succeed on a defense of laches, "a defendant must establish: '(1) the plaintiff knew of the defendant's misconduct; (2) the plaintiff inexcusably delayed in taking action; and (3) the defendant was prejudiced by the delay.'" *Republic of Turk. v. Christie's Inc.*, 62 F.4th 64, 71 (2d Cir. 2023) (quoting *Ikelionwu v. United States*, 150 F.3d 233, 237 (2d Cir. 1998)). The Court finds that Defendant has adequately alleged knowledge, (Dkt. No. 28, at 58, ("Plaintiff was aware that Defendant began using the EMPOWER Brand in 2014.")), inexcusable delay, (*id.* ("From 2014 until 2022, Plaintiff did not object to Defendant's use of the EMPOWER Brand, did not file any oppositions to any of Defendant's trademark applications, and otherwise took no steps to discourage Defendant's use of the EMPOWER Brand.")), and prejudice, (*id.* at 59 ("Defendant has invested substantial time and money developing the EMPOWER Brand since 2014")). Defendant has therefore sufficiently alleged a defense of laches.

Accordingly, the Court denies Plaintiff's motion to strike Defendant's first affirmative defense.

### 2.    Second Affirmative Defense (Unclean Hands)

Plaintiff argues that Defendant's second affirmative defense of unclean hands relies on one of its 2007 statements to the USPTO and that "the statement is irrelevant to Defendant's unclean hands defense and is improperly pleaded." (Dkt. No. 35-1, at 26; *see also* Dkt. No. 43, at 7).  Defendant responds that Plaintiff "focuses on the USPTO statements in a vacuum" and that Plaintiff's statements to the USPTO are support for the argument that Plaintiff "knew there was no likelihood of confusion before it changed its branding." (Dkt. No. 39, at 18). And Defendant

also states that the second affirmative defense relies on more than just Plaintiff's statements to the USPTO. (*Id.* at 20).

"The application of unclean hands is appropriate 'where the party applying for such relief is guilty of conduct involving fraud, deceit, unconscionability, or bad faith related to the matter at issue to the detriment of the other party.'" *Jackpocket, Inc. v. Lottomatrix NY LLC*, 645 F. Supp. 3d 185, 276 (S.D.N.Y. 2022), *aff'd*, 2024 WL 1152520, 2024 U.S. App. LEXIS 6383 (2d Cir. Mar. 18, 2024). Here too Defendant has pointed to ways that Plaintiff's rebranding is similar to Defendant's branding and has alleged that Plaintiff has made these changes "with the intent of associating itself with Defendant and to trade on Defendant's substantial name recognition and goodwill." (Dkt. No. 28, at 61). These facts are sufficient to allege bad faith and therefore also sufficient to plead a defense of unclean hands.

Accordingly, the Court denies Plaintiff's motion to strike Defendant's second affirmative defense.

### 3.      Third Affirmative Defense (Unclean Hands)

Plaintiff seeks to strike Defendant's third affirmative defense of unclean hands on the basis that "it relies upon alleged representations made during settlement discussions, which are inadmissible." (Dkt. No. 43, at 7). Plaintiff states that the representations referenced here "were purportedly made during the course of settlement discussions between the parties beginning in 2022" and that "Plaintiff did indeed reach out to Defendant in 2022 in order to propose a mutual co-existence agreement in order to attempt to avoid litigation." (Dkt. No. 35-1, at 29–30). Defendant takes the position that the statements at issue "could not have been 'offers of compromise' because Plaintiff "had not threatened or alleged any claim" and that they "were

explicit admissions and representations of fact."[19] (Dkt. No. 39, at 21; *see also id.* at 21–24). Additionally, Defendant contends that "even if the statements could be construed as falling under Rule 408," they are admissible because they are "used not to prove liability but to establish non-overlapping elements of affirmative defenses." (*Id.* at 21; *see also id.* at 24–26).

Under Rule 408 evidence of "conduct or a statement made during compromise negotiations about the claim" "is not admissible . . . either to provide or disprove the validity or amount of a disputed claim." Fed. R. Evid. 408(a). "Rule 408 extends to offers made before the initiation of litigation, but pre-litigation 'business communications' remain admissible." *Int'l Bus. Machines Corp. v. BGC Partners, Inc.*, No. 10-cv-128, 2013 WL 1775437, at \*9, 2013 U.S. Dist. LEXIS 59779, at \*27 (S.D.N.Y. Apr. 25, 2013) (citations omitted). The Second Circuit has explained that "[i]t is often difficult to determine whether an offer is made 'in compromising or attempting to compromise a claim'" and that "[b]oth the timing of the offer and the existence of a disputed claim are relevant to the determination." *Pierce v. F.R. Tripler & Co.*, 955 F.2d 820, 827 (2d Cir. 1992) (citations omitted). The Court cannot say from the face of Defendant's pleading that the documents in question fall into the category of statements during compromise negotiations or if they are better categorized as business communications. Consequently, the Court will not strike Defendant's third affirmative defense on this basis. *See, e.g.*, *D'Alosio v. EDAC Techs. Corp.*, No. 16-cv-769, 2017 WL 1439663, at \*3, 2017 U.S. Dist. LEXIS 60873, at \*6–7 (D. Conn. Apr. 21, 2017) (denying motion to strike certain paragraphs of the complaint when evidence "may be admissible" under Rule 408).[20]

---

[19] Defendant attaches a 2022 letter, (Dkt. No. 39-2), from Plaintiff to Defendant containing at least some of the specific pre-litigation statements used as the basis for Defendant's affirmative defenses, (*see* Dkt. No. 39, at 20–21). As this document is extrinsic to the pleadings, and neither party justifies why it should be included, the Court will not evaluate it at this time. *See Emps. Ins. Co. of Wausau*, 489 F. Supp. 2d at 179.

[20] Plaintiff also argues that the alleged representations "have no relevance on the affirmative defenses that they purportedly support," including the defense of unclean hands, because the statements relate to the *enforcement* of

34

Accordingly, the Court denies Plaintiff's motion to strike Defendant's third affirmative defense.

### 4.    Fourth Affirmative Defense (Acquiescence)

Among other objections to Defendant's fourth affirmative defense of acquiescence, (*see* Dkt. No. 35-1, at 26–27, 28–30)), Plaintiff argues that "Defendant has not, and cannot, properly plead a defense of acquiescence," explaining that "Defendant never claims that Plaintiff made an active representation that it would not bring suit" and that "Plaintiff filed this proceeding in August 2023, less than one year after Plaintiff first reached out to Defendant and after lengthy settlement discussions," (*id.* at 31; *see also* Dkt. No. 43, at 10–11). Defendant opposes Plaintiff's assertion that it did not make an active representation, stating that "[t]he presuit statements are further evidence of [Plaintiff's] pattern of conduct over more than a decade during which [Defendant] made substantial investments developing its EMPOWER Brand." (Dkt. No. 39, at 27).

"The elements of acquiescence are: '(1) the senior user actively represented that it would not assert a right or a claim; (2) the delay between the active representation and assertion of the right or claim was not excusable; and (3) the delay caused the defendant undue prejudice.'" *ProFitness Physical Therapy Ctr. v. Pro-Fit Orthopedic & Sports Physical Therapy P.C.*, 314 F.3d 62, 67 (2d Cir. 2002) (quoting *Times Mirror Mags., Inc. v. Field & Stream Licenses Co.*, 294 F.3d 383, 395 (2d Cir. 2002)). Unlike laches, which "implies a merely passive consent," "acquiescence implies active consent," and "[a]ctive consent is implied by 'conduct on the

---

Plaintiff's marks, not Plaintiff's *acquisition or use* of the marks. (Dkt. No. 35-1, at 30–31). However, "a motion to strike is not a vehicle through which factual disputes are to be resolved." *Cadet v. Alliance Nursing Staffing of N.Y.*, No. 21-cv-3994, 2023 WL 3872574, at *2, 2023 U.S. Dist. LEXIS 101256, at *6 (S.D.N.Y. Jan. 6, 2023) (citations omitted).

plaintiff's part that amount[s] to an assurance to the defendant, express or implied, that the plaintiff would not assert his trademark rights against the defendant." *Id.* (citations omitted).

The only possible *active* representations that Defendant indicates occurred here are within Plaintiff's 2022 letter proposing that the parties "confer regarding mutual coexistence and cooperation" and the "discussions that followed" where Plaintiff allegedly represented that it would "not seek any changes in Defendant's existing use of EMPOWER-formative marks." (*See* Dkt. No. 28, at 62). Although Defendant must establish that it was prejudiced because of an active representation, Defendant appears to rely on prejudice from delay extending back beyond 2022. (*See id.* ("Plaintiff thereafter filed this suit, alleging confusion, and seeking to bar Defendant from uses of EMPOWER-formative marks that date back to as early as 2014. Plaintiff's delay in bringing its claims was inexcusable. Plaintiff's delay caused prejudice to Defendant, including because Defendant has invested substantial time and money developing the EMPOWER brand *during those years*." (emphasis added))). However, in light of Defendant's admission that it has "since 2014 and through the present" "engaged in national advertising campaigns using the EMPOWER RETIREMENT, EMPOWER, or EMPOWER-formative marks to identify itself," (Dkt. No. 28, ¶ 65), and given the demanding standard for a motion to strike affirmative defenses, at this early stage the Court declines to strike the affirmative defense of acquiescence.

### 5.    Fifth Affirmative Defense (Equitable Estoppel)

Plaintiff argues that Defendant's fifth affirmative defense of equitable estoppel "is entirely reliant on" Plaintiff's 2007 statements made to the USPTO and that "Defendant fails to establish any connection between" those statements "and the elements of its affirmative defense." (Dkt. No. 35-1, at 27; *see also* Dkt. No. 43, at 11–12). Defendant responds that Plaintiff's "conduct over more than a decade—its USPTO statements, its failure to object to the

36

development of the EMPOWER Brand or to file oppositions to [Defendant's] trademark applications or to otherwise discourage [Defendant's] use of its EMPOWER Brand—constitute [sic] the concealment of material facts and/or false misrepresentations when [Plaintiff] had actual or constructive knowledge that there was, in fact, a risk of confusion." (Dkt. No. 39, at 19). Defendant states that its fifth affirmative defense is not wholly reliant on Plaintiff's 2007 USPTO statements. (*Id.* at 20).

"Under New York law, the elements of equitable estoppel are with respect to the party estopped: (1) conduct which amounts to a false representation or concealment of material facts; (2) intention that such conduct will be acted upon by the other party; and (3) knowledge of the real facts." *Brenner v. Brenner*, 821 F. Supp. 2d 533, 542 (E.D.N.Y. 2011) (quoting *In re Vebeliunas*, 332 F.3d 85, 93–94 (2d Cir. 2003)). Defendant's fifth affirmative defense alleges that, "Plaintiff obtained registrations for Plaintiff's Marks by making representations to the USPTO," that "Plaintiff was aware that Defendant began using the EMPOWER Brand in 2014," and that "[f]rom 2014 until 2022, Plaintiff did not object to Defendant's use of the EMPOWER Brand, did not file any oppositions to any of Defendant's trademark applications, and otherwise took no steps to discourage Defendant's use of the EMPOWER Brand." (Dkt. No. 28, at 62–63). At no point in its affirmative defense does Defendant allege that Plaintiff engaged in any of this conduct with the intent that it would be acted upon by Defendant. (*See id.*). Nor is that a plausible inference from the allegations. Because Defendant has failed to assert a legally sufficient claim of equitable estoppel, the Court will grant Plaintiff's motion to strike Defendant's fifth affirmative defense. *See Sec. & Exch. Comm'n v. Rayat*, No. 21-cv-4777, 2021 WL 4868590, at *2, 2021 U.S. Dist. LEXIS 201036, at *4 (S.D.N.Y. Oct. 18, 2021) ("Although

'[m]otions to strike affirmative defenses under Rule 12(f) are disfavored,' courts have not hesitated to grant them when a defense is legally insufficient." (citation omitted)).

### 6.    Sixth Affirmative Defense (Anti-trust)

Plaintiff seeks to strike Defendant's sixth affirmative defense alleging anti-trust violations under the *Noerr-Pennington* Doctrine.[21]  (Dkt. No. 35-1, at 31–32). Defendant responds that it has sufficiently pleaded that Plaintiff is engaged in "sham litigation" and thus the *Noerr-Pennington* doctrine does not bar its defense. (Dkt. No. 39, at 28–29). Plaintiff in its reply brief states that "Defendant has simply failed to plead that this litigation is a sham" and reiterates the basis for the dispute. (*See* Dkt. No. 43, at 13–14).

"Under the *Noerr–Pennington* doctrine, litigation as well as concerted efforts incident to litigation may not serve as a basis for an antitrust claim." *Radiancy, Inc. v. Viatek Consumer Prods. Grp.*, 138 F. Supp. 3d 303, 325 (S.D.N.Y. 2014) (citation omitted). "There exists, however, an exception to the *Noerr Pennington* doctrine for 'sham' litigation." *T.F.T.F. Cap. Corp. v. Marcus Dairy, Inc.*, 312 F.3d 90, 93 (2d Cir. 2002). "To establish 'sham' administrative or judicial proceedings, a plaintiff must show that the litigation in question is: (i) 'objectively baseless,' and (ii) 'an attempt to interfere directly with the business relationships of a competitor through the use of the governmental process—as opposed to the outcome of that process—as an anticompetitive weapon.'" *Primetime 24 Joint Venture v. Nat'l Broad., Co.*, 219 F.3d 92, 100–01 (2d Cir. 2000) (quoting *Prof. Real Est. Invs., Inc. v. Columbia Pictures Indus.*, 508 U.S. 49, 60 (1993)).

---

[21] Plaintiff makes multiple other objections to the contents of the sixth affirmative defense including the relevance of an alleged admission to the USPTO, the relevance of statements made in the course of discussions over the co-existence agreement, and the admissibility of those discussion statements. (*See* Dkt. No. 35-1, at 27–28, 31). Defendant, on the other hand, argues that the contested statements are relevant, (Dkt. No. 39, at 19–20, 27–28), and the Court will not find the co-existence agreement statements inadmissible at this time for the same reasons as previously stated.

Defendant has adequately pleaded facts for both elements. First, Defendant has pleaded facts indicating that the litigation is objectively baseless. (*See* Dkt. No. 28, at 63 ("Plaintiff has admitted that there is no likelihood of confusion between federal credit union services and non-federal credit union services."); *id.* ("Plaintiff explicitly represented to Defendant that there is no likelihood of confusion between Defendant's use of EMPOWER-formative marks and Plaintiff's Marks.")). Second, Defendant has pleaded that Plaintiff is attempting to use litigation against competitors for anti-competitive purposes. (*See id.* ("Plaintiff has further proposes [sic] and demanded anticompetitive terms as conditions for amicable coexistence and avoidance of lawsuits."); *id.* ("Plaintiff has further filed lawsuits alleging likelihood of confusion between non-federal credit union uses of EMPOWER-formative Marks and Plaintiff's Marks.")). Plaintiff in its reply brief restates certain facts underlying its claims to show that the case is not baseless, (*see* Dkt. No. 43, at 13–14), but the Court must accept Defendant's allegations as true at this stage in the litigation, *see Emps. Ins. Co. of Wausau*, 489 F. Supp. 2d at 179. Thus, as Defendant has sufficiently alleged that Plaintiff is engaging in sham litigation, the Court will not strike this affirmative defense under the *Noerr-Pennington* doctrine.

### 7.     Leave to Amend

Defendant argues that "[t]o the extent the Court strikes any of [sic] portion of any of [Defendant's] [a]ffirmative [d]efenses, it should grant [Defendant] leave to amend its affirmative defenses and to elaborate further the allegations relating to such." (Dkt. No. 29, at 29). Plaintiff opposes this request because "Defendant has already had an opportunity to correct its deficient defenses, but chose not to do so" when it amended its counterclaims and because the affirmative defenses "are not legally cognizable and thus not correctable and they rely on pleaded facts which are not admissible including statements made during settlement negotiations, as well as arguments made before the USPTO." (Dkt. No. 43, at 14).

As previously discussed, Rule 15(a)(2) states that "[t]he court should freely give leave [to amend pleadings] when justice so requires." F. R. Civ. P. 15(a)(2). Even though Defendant could have amended its affirmative defenses along with its counterclaims, it had not yet had "the benefit of the Court's reasoning." *See U.S. ex rel. Hart v. McKesson Corp.*, 602 F. Supp. 3d 575, 598–99 (S.D.N.Y. 2022) (discussing the appropriateness of letting a party amend its complaint after hearing from the court). For these reasons, and because Defendant may be able to replead its fifth affirmative defense with sufficient facts to withstand a motion to strike, the Court grants Defendant leave to replead this affirmative defense. *See, e.g.*, *Aparicio v. Compass Recovery Grp., LLC*, No. 21-cv-452S, 2021WL 3684566, at *2–3, 2021 U.S. Dist. LEXIS 157133, at *5–7 (allowing the defendant to replead affirmative defenses lacking sufficient factual support). If it chooses to amend it must file amended affirmative defenses within twenty-one days of this Order.

## V.   CONCLUSION

For these reasons, it is hereby

**ORDERED** that Defendant's motion to dismiss (Dkt. No. 10-1) is **GRANTED in part and DENIED in part**; and it is further

**ORDERED** that Plaintiff's claims alleging unfair competition under a theory of palming off and claims under Sections 349 and 350 of the New York General Business Law are **DISMISSED without prejudice**; and it is further

**ORDERED** that Plaintiff's motion to dismiss counterclaims four and five (Dkt. No. 46) is **GRANTED in part and denied in part**; and it is further

**ORDERED** that Defendant's fourth counterclaim is **DISMISSED** with respect to cancellation based on lack of intent-to-use and fraudulent obtainment, but it survives with respect to cancellation based on abandonment; and it is further

**ORDERED** that Defendant's fifth counterclaim is **DISMISSED**; and it is further

**ORDERED** that Plaintiff's motion to strike affirmative defenses (Dkt. No. 35) is **GRANTED in part and DENIED in part**; and it is further

**ORDERED** that Defendant's fifth affirmative defense for equitable estoppel is stricken, and the motion to strike is otherwise **DENIED**; and it is further

**ORDERED** that any amended complaint or amended affirmative defenses must be filed within twenty-one (21) days of this Order.

**IT IS SO ORDERED.**

Dated: <u>August 2, 2024</u>
       Syracuse, New York

Brenda K. Sannes
Chief U.S. District Judge